# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **SARA YVONNE BENTLEY** | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE |
| v. | ) | |
| | ) | |
| **AARON REED TRIPLETT D/B/A** | ) | |
| **AARON R. TRIPLETT ATTORNEY AT** | ) | |
| **LAW** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | **COMPLAINT** |
| | ) | |
| | ) | **JURY DEMAND ENDORSED HEREON** |
| | ) | |

Plaintiff Sara Bentley ("Bentley") for her Complaint against Defendant Aaron Reed Triplett d/b/a Aaron R. Triplett Attorney at Law ("Triplett") states as follows:

## PARTIES

1. Bentley is a Kentucky Citizen who, during all times relevant to this Complaint, was employed in Scioto County, Ohio by Defendant.

2. Triplett is an Ohio citizen who operates a law firm in Portsmouth, Scioto County, Ohio. During all times relevant to this Complaint, Triplett employed Bentley as a paralegal.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332. There is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1391, because Defendant conducted activities that gave rise to the claim for relief in Scioto County, Ohio and because all or a part of the claims for relief arose in Scioto County, Ohio.

## STATEMENT OF FACTS

5. Triplett is an Ohio attorney who operates a law firm as a solo practitioner.

6. In October 2020, Triplett hired Bentley to work as his paralegal.

7. Bentley's work for Triplett was exemplary. She immediately improved firm efficiency and profitability. Bentley earned numerous bonus payments as a result of her performance.

8. Bentley worked for Triplett without incident for the first nine months of her employment.

9. However, beginning in June 2021, Triplett—who is more than 25 years older than Bentley—began to make romantic advances towards Bentley.

### Triplett Begins Including Unwanted Love Letters with Bentley's Bonus Payments

10. Triplett began initiating his advances by including a handwritten love note to Bentley in the same envelope as her bonus payment. In his first such letter to Bentley on June 22, 2021, Triplett wrote, in part, "My job requires a lot of thought but often I can't say what I really feel. … Will do about anything for you." (See June 22, 2021 letter from Triplett to Bentley, enclosed as **Exhibit A**).

11. Bentley did not reciprocate Triplett's romantic interest, informed him of same, and told him to stop writing her letters.

12. Undeterred, Triplett continued to provide unwanted notes to Bentley in each of the envelopes that included her earned wages.

13. In a July 28, 2021 unsolicited note from Triplett to Bentley, Triplett referred to Bentley in the third person, stating "My favorite bimbo kept the train on the tracks + making good time. She has [a] good sense of humor and tolerates me well. I hope she knows I love her. Wish I could do more for her but truly I think she has found a pretty good gig." (See July 28, 2021 letter from Triplett to Bentley, enclosed as **Exhibit B**).

14. Bentley continued to refuse Triplett's advances.

15. Despite being aware that his advances were unwanted, Triplett persisted in sending love letters to Bentley. In fact, Triplett began to infuse his letters with sexual language. For example, in an October 1, 2021 letter to Bentley, Triplett stated, in part "Yes, I said I'll be good to you + I will but please let me boss you around just a little. I won't say "you're doing a good job." That sounds too work related. You make me happy. Much better! *I about ____ my jeans when you ask if you can do something for me.* Take care of yourself. In love, A Trip." (See October 1, 2021 letter from Triplett to Bentley, enclosed as **Exhibit C**) (emphasis added).

16. Though Bentley continued to refuse Triplett, Triplett responded by escalating his unwanted advances. Triplett stated that "men have needs" in his October 16, 2021 letter to Bentley. (emphasis in original). (See October 16, 2021 letter from Triplett to Bentley, enclosed as **Exhibit D**).

### Ignoring Her Objections, Triplett Touches Bentley Inappropriately and Reaffirms that He Will Continue to Harass Her

17. Triplett again escalated his unwanted advances in December 2021 by approaching Bentley as she worked at her desk and inappropriately touching her on the shoulders and the neck. When Bentley immediately rebuffed his advances and told him not to touch her, Triplett asked Bentley "Do you like working here?" making it clear that he expected her to acquiesce to his demands as a condition of ongoing employment.

18. Triplett continued to include unwanted letters with each of the paychecks he provided to Bentley. In his January 4, 2022 letter, Triplett reflected on how Bentley would eventually acquiesce to his advances: "you might not want to be seen with me yet. I think you have stumbled into a good man. I wouldn't write these letters—good, bad, or crappy—if I didn't like to think about you. Pretty sure Dr. Phil would give me at least a B+ in my treatment of Miss B." (See January 4, 2022 Letter from Triplett to Bentley, enclosed as **Exhibit E**).

### Triplett Withholds Bentley's Paycheck in Response to Her Refusing His Advances

19. On March 24, 2022, Triplett again touched Bentley inappropriately. Once again, Bentley immediately pulled away from Triplett and told him not to touch her.

20. Triplett responded to Bentley's refusal by stating that she "need[ed] to lighten up." Again, Triplett asked Bentley if he she truly wanted to work at this firm.

21. In a clear attempt to exert his power over Bentley, Triplett refused to provide Bentley with her earned wages following her refusal, withholding her pay leading her to believe she would not be paid for her work before eventually providing her with her earned wages.

### Bentley Pleads "I just want to be a paralegal for you" In Response to Triplett's Sexually Harassing Text Messages.

22. On May 13, 2022, Triplett sent Bentley a non-sequitur text message after hours stating, in part, "U should feel me !" Once again, Bentley immediately repudiated Triplett's advances:



(See Text Messages between Triplett and Bentley, enclosed as **Exhibit F**).

23. Triplett followed up his text by stating that he was "trying to get [her] to stay close" and stating that he loved Bentley. (Id.). Bentley, in response, stated that they only have a professional relationship. Bentley further pleaded with Triplett, stating "I just want to be a paralegal for you but that's all." (Id.):



(**Exhibit F**).

### **Triplett Further Escalates His Sexual Misconduct**

24. Triplett continued to escalate his unwanted sexual advances towards Bentley in the weeks that followed. Triplett approached Bentley from behind as she was working at her desk, placed his hands on her shoulders and placed his crotch against her back. As always, Bentley refused Triplett's advances, and asked him to let her work in peace.

6

25. On June 21, 2022, Triplett approached Bentley at her desk. Triplett then kneeled down next to Bentley and attempted to place his head on Bentley's skirt. Bentley immediately got up from her chair and cried as she again refused Triplett's advances.

**Triplett Illegally Accesses Bentley's Private Social Media Account and Terminates Her Employment**

26. Triplett's behavior continued to grow more unhinged with each passing denial of his sexual advances.

27. Bentley also observed that Triplett had written her name and her birthday on the wall of his office: "Sara 10-7 BD."



(See Photograph of Triplett's Office, enclosed as **Exhibit G**).

28. Prior to reporting to work on June 22, 2022, Bentley was notified that someone located at Triplett's office had reset her Facebook password. As Triplett was the only individual at Triplett's office, Bentley knew immediately that Triplett had accessed her Facebook account without authorization. She reported the incident to Facebook and was devastated not knowing how many private photos, messages and other private information Triplett may have seen or stolen from her account.

29. When Bentley arrived at work that day, Triplett was sitting in his office in the dark looking at his laptop. Bentley nevertheless sat at her desk and began to work. Within 30 minutes

of Bentley working at her desk, Triplett approached Bentley, dragging a chair beside hers, blocking her way out of the office. Feeling cornered and threatened by Triplett's advances, Bentley jumped up quickly and rushed past Triplett. As she passed Triplett, he stated "you're fired." When Bentley asked why he fired her Triplett stated "obviously, you're not a good fit here."

30. Triplett also provided Bentley with a written notice of her termination:

> Sara, 6-22-2022 I told you that I think we should go our separate ways and that you should look for another job. I want no bitterness from either of us. Please don't delay.

(See Termination Letter, enclosed as **Exhibit H**).

31. Nevertheless, Triplett asked Bentley to continue working for a short period of time to prepare files as Triplett was unable to complete administrative tasks himself. As Bentley required her income to support herself and her family, she continued working with the understanding that she was effectively terminated with a limited period of notice.

32. On June 27, 2022, Bentley asked Triplett about the reason for her termination. In response, Triplett expressed that he was choosing to terminate Bentley's employment because she was dating someone, and that Triplett had learned about it because of something he had seen "on the internet."

33. Triplett also confirmed that he had learned that Bentley had a boyfriend when he hacked and accessed her Facebook:

> Bentley: I don't know what you're talking about. I got a notification when I was at the doctor the other morning, saying that you hacked my Facebook. It had the IP address here. So, I'm guessing you seen, you're on my Facebook. You talking about that?
>
> Triplett: So?
>
> Bentley: I figured that was it.
>
> Triplett: So?

8

34. Triplett also confirmed that he was terminating Bentley's employment because she was dating someone else:

> Triplett: … I can be pushy, I can be aggressive, but I've been damn good to you.
>
> Bentley: But you're my boss?
>
> \*\*\*
>
> Triplett: … From here on out, I could never stand to be around you, knowing that you're out with someone else.
>
> \*\*\*
>
> Triplett: … You know, I'll take the blame, baby. You know, if it's jealousy it's jealousy. So, but I can't live that way. So I will take the blame. I like you more than you like me. And, so… I'm sorry it seems unfair that …. You'll find [inaudible] a $20 an hour job, so…

## COUNT I
### (Wrongful Termination in Violation of Public Policy—Sexual Harassment)

35. Bentley incorporates by reference the foregoing allegations as if fully rewritten herein.

36. Though R.C. 4112.02 applies to employers of four or more persons in the state, the Ohio Supreme Court has long held that employers of fewer than four employees may be liable for wrongful termination in violation of public policy. *Collins v. Rizkana*, 73 Ohio St. 3d 65, 74 (1995) ("we cannot find it to be Ohio's public policy that an employer with three employees may condition their employment upon the performance of sexual favors while an employer with four employees may not.").

37. Bentley was subjected to sexual harassment by Triplett, and was terminated as a result of *quid pro quo* sexual harassment.

38. Bentley's termination jeopardizes public policy.

39. As a result of Bentley's termination, Bentley has suffered lost wages, lost benefits, embarrassment, loss of future earnings, non-economic damages, costs, and attorney's fees.

## COUNT II
### (Intentional Infliction of Emotional Distress)

40. Bentley incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

41. Triplett intended to cause, or knew or should have known that his actions would result in serious emotional distress to Bentley.

42. Triplett's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community.

43. Triplett's actions proximately caused psychological injury to Bentley.

44. Bentley has suffered serious mental anguish of a nature that no reasonable person should be expected to endure.

## COUNT III
### Battery (Sexual Touching)

45. Bentley incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

46. In touching Bentley without consent, Triplett acted with intent to cause harmful or offensive contact.

47. Triplett's unwanted contact with Bentley was offensive to a reasonable sense of personal dignity.

## COUNT IV

**Unauthorized Use of Telecommunications Service or Information Service**

48. Bentley incorporates the allegations contained in the previous paragraphs as if fully rewritten herein.

49. Pursuant to R.C. § 2307.60, Bentley may recover her full damages in a civil action as a result of a criminal act.

50. R.C. § 2913.04, among other things, established criminal liability for any person who "in any manner and by any means, including, but not limited to , computer hacking, shall knowingly gain access to, or cause access to be gained to any … telecommunications service, or information service" without consent.

51. Triplett's conduct constitutes a violation of R.C § 2913.04.

52. As a direct and proximate cause of Triplett's misconduct, Bentley has been damaged and, accordingly, Bentley is entitled to an award of compensatory damages.

**PRAYER FOR RELIEF**

WHEREFORE, Bentley requests judgment against Triplett as follows:

1. Awarding Bentley compensatory and punitive damages;

2. Awarding Bentley her reasonable costs and attorney's fees necessarily incurred herein; and

3. Awarding Bentley such other and further relief as the Court deems just and proper.

Respectfully submitted,

11

12

Christopher J. Lalak (0090079)
**LALAK LLC**
1991 Crocker Road
Suite 600
Westlake, OH 44145
Telephone 440.892.3380
Email:	clalak@employmentlawohio.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

Christopher J. Lalak

*Counsel for Plaintiff*